# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## DELTA DIVISION

MICHAEL PAUL SLATTERY                          PETITIONER

v.                                                No. 2:98CR125-B

UNITED STATES OF AMERICA                       RESPONDENT

## MEMORANDUM OPINION

This matter comes before the court on the April 30, 2002, petition of Michael Paul Slattery for a writ of *habeas corpus* under 28 U.S.C. § 2255, as well as his April 15, 2002, motion for a new trial. The government responded to the motions July 10, 2002; the petitioner replied October 31, 2002. The matter is ripe for decision. For the reasons set forth below, the instant petition for a writ of *habeas corpus* shall be denied.

### Procedural Posture

Michael Paul Slattery was tried by jury May 19 and 20, 1999, for crossing state lines with the intent to engage in sex with a minor in violation of 13 U.S.C. § 2423(b). The court, however, declared a mistrial after the government referred to documents not in evidence in its closing arguments. Slattery was tried again November 1 through November 3, 1999, and the jury returned a verdict of guilty. The court sentenced Slattery to eighteen months imprisonment, two years supervised release, and a $100.00 special assessment. Slattery appealed, through counsel, to the Fifth Circuit on March 24, 2000. The Fifth Circuit affirmed the conviction and sentence. Slattery filed the instant *pro se* petition for a writ of *habeas corpus* April 30, 2002, challenging his conviction on several grounds. For the reasons set forth below, the instant petition for a writ of *habeas corpus* shall be denied.

**The Petitioner's Claims**

Michael Paul Slattery sets forth the following grounds for relief in his petition for a writ of *habeas corpus* under 28 U.S.C. § 2255:

1.      Counsel were ineffective for failing to:

      a.      investigate mitigating exculpatory evidence, namely the computer, telephone, printer, employment, and America Online records of James Shepherd, as well as testimony of Shepherd's common-law wife Kimberly Clark and her daughter Ashley.[1]

      b.      interview defense and prosecution witnesses, namely Kimberly Clark and her daughter Ashley.

      c.      subpoena exculpatory *Brady* and *Jencks* material, such as the offense report Shepherd executed implicating the petitioner, as well as Shepherd's criminal sexual contact with his stepdaughter Ashley.

      d.      object to denial of jury instruction on an entrapment defense

      e.      adduce sufficient evidence to warrant an entrapment instruction

      f.      challenge the jury instruction regarding intent, particularly the language "as a general rule."

      g.      move to quash the indictment for want of subject matter jurisdiction.

2.      The court applied 18 U.S.C. §§ 2423b and 2243a unconstitutionally, as no crime was committed on federal property; instead, government officials "lured" Michael Paul Slattery across state lines.  *See Caminetti*, 242 U.S. 470 (1917).

3.      The court applied 18 U.S.C. §§ 2423b and 2243a unconstitutionally, as the statutes were used to convict Slattery for his thoughts in the absence of an overt act.

---

[1]Shepherd never actually married Kimberly Clark, although they lived together as husband and wife, and Shepherd frequently referred to Ashley as his stepdaughter.  Thus, in the interest of brevity, the court shall refer to Ashley as Shepherd's daughter for the remainder of this memorandum opinion.

## Electronic Communication

One cannot get a clear picture of this case without an understanding of internet chat rooms and instant messaging, two relatively recent forms of electronic communication. The instant case begins in an internet chat room, which is not a place, *per se*, but, instead a method for anyone with a computer and a connection to the internet to converse – instantly – with others similarly equipped about a common interest. Chat room conversations appear as text on a computer screen, with the participants' screen names followed by the text of their conversations. Many chat rooms have innocuous or wholesome topics – health matters, local events, *etc.* – while others, such one in the instant case, are devoted to a more sinister purpose. Chat rooms often have moderators and can thus be monitored; in addition, chat rooms are designed to facilitate conversations among large groups of people – up to twenty-three in the present case. For these reasons, once the electronic chats between two "chatters" turn to specific content where privacy (or discussion of illegal activity) becomes a concern, they then turn to an instant messaging service – a two-way instantaneous text communication similar to a chat room – but with no one to monitor. The text from conversations in chat rooms is often in the form of internet slang, using little or no punctuation, non-standard phonetic spelling, and few capital letters. Examples include, "u" for "you," "k" for "okay," "kewl" for "cool," and "lol" for "laugh out loud." This explanation should make the conversations and discussions leading up to Michael Paul Slattery's arrest clearer.

## Evidence Introduced at Trial

The parties introduced testimony, documentary evidence, and tape recordings to establish the facts described below. Michael Paul Slattery, the petitioner in the instant *habeas corpus* case,

engaged in electronic conversations in an internet chat room called "FunAtHome" where members discuss incestuous relationships with their children – and sometimes use the chat room as a springboard to arrange meetings with other "chatters" to swap children for sexual gratification. Once a person using such a chat room – and perhaps an instant messaging service – has sufficient confidence that his correspondent is serious about continued discussions and possibly a meeting, he will turn to more traditional telecommunications, such as a home phone or a cellular phone, to facilitate and plan such a meeting. That is what transpired in the present case.

James Shepherd, the government's primary witness, testified that the first contact he remembered with Slattery was on Halloween night in 1998 – in the FunAtHome chat room. Shepherd claims to have entered FunAtHome accidentally – that he had intended instead to enter the chat room called "Memphis Town Square," in which the "chatters" discuss various events around the Memphis area. Shepherd said he first realized his mistake after he had received several instant messages from "Fun4uinAla," Slattery's screen name.[2] Shepherd stated that he was not paying close attention to the instant messages at first, as they merely involved basic information, such as "*Hello, how are you doing, where are you from, where do you live, what are you doing tonight*." Trial transcript, p. 50. Further, rather than follow the conversation with Slattery straight through, by leaving the instant message text box on his computer screen, Shepherd had been closing the text box after each brief exchange in the conversation. This had

---

[2]The court shall hereafter refer to the petitioner as "Slattery" and the government's primary witness as "Shepherd," regardless of the form of communication and their various screen names or e-mail addresses.

the effect of "erasing" the previous conversation, as any new messages would appear on the screen without the previous text.

Shepherd said he exchanged photographs with Slattery during their initial instant message communication that night. After that exchange, the conversation slowly turned from ordinary topics to sex – then to sex with minors. Shepherd said he was taken aback once he realized the common interest of those in the chat room FunAtHome (incest) – and the content of several of Slattery's instant messages (sex with minors).[3] That was the point where Shepherd decided to leave the instant message text screen up on his computer – and turn on the logging feature of his instant message service. The logging feature captures instant message conversations and stores them as text on the computer for retrieval and viewing later. Shepherd stated that he was extremely offended by the content of the internet chat conversations, but he did not simply exit the program because "[S]omeone that would be discussing those kind[s] of issues with anybody that quick, that they didn't even know, needed to be reported to the police department and to America Online, to somebody." Trial Tr. p. 60.

After their Halloween chat and instant message communications, the two agreed that Slattery would drive with his daughter[4] from Alabama to Mississippi at which time Shepherd and Slattery would "exchange daughters sexually." Trial Tr. p. 60. Shepherd testified that Slattery had come up with the plan, and Shepherd had simply gone along with the conversation "[t]o see .

---

[3]As discussed in much greater detail below, the truth of much of Shepherd's testimony was in sharp dispute at trial, particularly regarding his disapproval of the content of the FunAtHome chat room and of Slattery's messages. This dispute sharpened further when Shepherd was later convicted in state court for molesting his daughter.

[4]The "daughter" to which Slattery referred was not actually his daughter, but instead his girlfriend Coy – who was in her mid-twenties.

. . if this guy was playing around or if he was actually serious.  And the more he said, the more I

felt he was very serious about it."  Trial Tr. p. 61.  Shepherd testified that he then "maximized"

the instant message text box so that it filled the entire screen – and printed the conversation that

day.  Slattery then sent Shepherd an e-mail November 2, 1998:[5]

> James, right?  Going to talk to Coy [Slattery's "daughter"] . . . tonight.  Just
> making sure you are serious and would meet us.  Will work on photo.  Have one
> of daughter?  Mike.

Two days later, November 4, 1998, Shepherd delivered the chat log to the Southaven Police

Department, where he spoke with several police officers and a detective about the conversation

recorded in the log.  The detective, in turn, contacted the Federal Bureau of Investigation

("FBI").  The detective told Shepherd not to have any more contact with Slattery until the FBI

got involved.  Shepherd complied with that direction; thus, all subsequent communication

Shepherd had with Slattery was under the direction of the FBI.  Shepherd spoke with an FBI

agent several days later and gave the FBI permission to search the hard drive of his computer.

The agents also told Shepherd that they would come over to his house the next night to see if

Slattery would contact Shepherd again – and to see if he was serious about the meeting.  They

told him to send Slattery one e-mail to say that Shepherd would be out of town for a while

(apparently to give the FBI time to search Shepherd's hard drive).  Shepherd then received an e-

mail from Slattery November 5, 1998:

> She [Coy] was a little concerned about ages.  What are they again?  This weekend
> bad, too.  Stay in touch.  Mike.

---

[5]The electronic communications between the petitioner and the government witness
James Shepherd use internet slang many times; the court has occasionally inserted text in square
brackets to clarify some of the quotes using this slang, and to give the quotation the proper
context.

At the direction of FBI Special Agent Killinger, Shepherd responded that same day:[6]

> Hey, Mike, yes, we are serious. Just not sure if we can get together this weekend.
> I will find you online in the next couple of days and we will go from there, okay?
> Let me know what your daughter said as soon as you hear from her, okay? James.

Shepherd wrote again on November 6, 1998:

> This weekend is bad for me, too. Next weekend is better. Next weekend is a
> better weekend. I will be online Monday evening after 5:00 or so if you would
> like to chat some more. Oh, yeah, her age is 15. Mine 28. Hope this works so we
> can meet. James.

Slattery wrote to Shepherd November 9, 1998:

> If Coy is not available due to school or schedule, would you ever consider just the
> three of us? Mike. Trying to get pic[ture of Coy] scanned.

Shepherd responded that same day:

> That would be fine on just the three of us. I am still trying to [get] a pic[ture]
> scanned of [Ashley]. Find me online sometime. My wife is out of town this week
> so I should be on a lot this week. James.

In the time between the exchanges above and Slattery's arrest, Michael Paul Slattery

engaged in numerous conversations with James Shepherd regarding incest – and swapping or

"sharing" their daughters in a sexual liaison. Much of the language Slattery and Shepherd used

throughout these discussions was sexually explicit, direct, and vulgar – and will thus not be

repeated in this opinion. Slattery discussed having sex with his own "daughter," Coy, who (he

claimed) was in her mid-twenties. Shepherd described having sex with his daughter "Ashley,"

who (he claimed) was fifteen. Each man shared various methods he used to seduce his daughter

– and the various sexual acts performed with her. Although Shepherd's account of his daughter's

---

[6]All of Shepherd's contacts with Slattery from that point forward were with the
knowledge of the FBI.

age varied a bit, it appears that the highest age he reported in his conversations with Slattery was fifteen.  Michael Paul Slattery made his desire to perform specific sexual acts with Shepherd's fifteen-year-old daughter crystal clear, interrogating Shepherd repeatedly as to his daughter's willingness to perform various sexual acts with Shepherd, Slattery, or both.  Throughout these discussions Slattery repeatedly verified "Ashley's" age.

In one exchange Shepherd asked Slattery, "You do know my daughter is under age?" Slattery responded, "That's my only concern with mine, but I will coach her and convince her." Shepherd then asked, "Is that a problem for you?"  Slattery answered, "Not for me.  Excites me . . .."  Thus, Slattery admitted that the very fact Shepherd's daughter was underage aroused him, and that he would take steps to convince his "daughter" Coy to participate in the liaison.  In another exchange, on November 11, 1998, the day before Slattery's drive from his home in Alabama to meet Shepherd and his daughter in Mississippi, Slattery asked, "your[ daughter] is 15?"  Shepherd responded, "yes she is 15 but looks 18."  A bit later in the exchange Shepherd said, "we have even done a video once."  Slattery replied, "oh r[e]ally . . . you take pics of us? thats dangerous you know.  u have one now?"  When Shepherd confirmed that he still had the video, Slattery responded, "lets w[at]ch it . . who filmed it?"  Shepherd said, "yes we can watch it," and Slattery said, "lets . . . please . ."  Near the end of this lengthy exchange, Shepherd let Slattery believe that "Ashley," Shepherd's daughter, was viewing the text as it appeared on the screen.  Slattery responded, "bye . . ashley . . . cant wait to play . . you take care of Dad tonite . . save me some."

Both before and after instant message conversation of November 11, 1998, Slattery and Shepherd exchanged e-mails to decide where the liaison would take place, who would be there,

and what the "ground rules" would be, regarding what sexual acts Shepherd and "Ashley" would be willing to perform with Slattery – and which acts would be off-limits.  Through these e-mails, and two phone conversations, Slattery and Shepherd decided that Slattery would drive from Alabama to Southaven, Mississippi and meet Shepherd and "Ashley" at a Steak and Shake restaurant across the street from the Hampton Inn, where they would retire for the sexual encounter.  In one phone conversation, Slattery revealed that he had been communicating with a woman in Tennessee about arranging a sexual tryst with Slattery, the woman, and her eleven-year-old daughter.  He told Shepherd that if things worked out well with the Tennessee woman and her young daughter, Slattery would share the contact information so Shepherd could enjoy sex with them, as well.

The FBI and the local police used the information gleaned from Shepherd's communications with Slattery to prepare for his arrest should he actually travel to Southaven to carry out his plan with Shepherd and "Ashley."  The FBI used a helicopter and numerous vehicles to follow Slattery from his home in Alabama to Southaven, Mississippi.  Angel Burrus, a young lady who at the time worked for the Southaven Police Department, posed as "Ashley."  Burrus was nearly twenty-one years old at the time of Slattery's arrest.  Law enforcement personnel placed electronic eavesdropping devices inside Shepherd's truck, on Shepherd, and Burrus, who waited inside the Steak and Shake, while Shepherd waited just outside.

Slattery departed from him home outside Huntsville, Alabama, at about 1:00 p.m. November 12, 1998.  He left three voice mail messages for Shepherd during his drive from Alabama to Southaven, Mississippi.  In the first message, Slattery said:

Hey, James, Mike. Wanted to let you know it's one o'clock. I'm on my way there and so you and Ashley know what's going on, I'll touch base in a couple of hours in case I get lost. Maybe you want to get a room with two beds for the overnighter so we can spread out. See you then. Bye.

In his second message for Shepherd, Slattery said:

Hey, James, it's Mike. I'm on the highway. I'm on 78 at 2:00 – 20 minutes to 3:00, so I shouldn't have any problem meeting you. Take care. I'll see ya 4:00 or earlier. Bye bye.

In his final message, Slattery said:

Hey Charles(sic), Mike, my car phone number is 256-682-5078. Again, 256-682-5078. If you get a chance to, give me a call when you get this. Bye.

Each man had described his vehicle to the other to aid in identification for the initial meeting. Slattery and Shepherd greeted each other outside the Steak and Shake. They made a bit of small talk then discussed how Shepherd began having sex with his daughter. They broached the reason for Slattery's three-hour drive; Slattery said he wanted to watch Shepherd have sex with "Ashley," and they both decided that the best way to include Slattery was for Slattery slowly to join Shepherd and "Ashley" once they had started having sex. Shepherd confirmed that he and his wife participated in three- and four-way sex with other couples – and that "Ashley" did not know it. Slattery made sure "Ashley" was taking birth control pills, and the two men discussed in great detail the ground rules for the encounter. After the men had established the basic ground rules, Shepherd gestured for "Ashley" to come join them outside. Once she arrived, the two men verified that "Ashley" agreed with the ground rules.

Just after that, Slattery was placed under arrest. When the police conducted a search of Slattery's vehicle, he had brought a change of clothes, a toiletry kit, condoms, and copies of chat logs from his chats with Shepherd, a laptop computer, and other items. After Slattery's arrest,

FBI Special Agent Donald McVay executed a search warrant at Slattery's residence at 231 Pebblebrook Drive in Madison, Alabama. During McVay's search of the residence, Slattery's telephone rang. McVay answered, "Hello," and Slattery's girlfriend Coy Scott said, "Tell me all the gory details." Tr. p. 319. She was talking about Slattery's trip to Southaven to "engage in sex with a father and his daughter;" where the daughter was supposed to be "15 or 16." Tr. p. 317.

### The Government's Choice of Witnesses and Documentary Evidence

The petitioner has one basic claim regarding the government's use of James Shepherd as a witness; his other claims are without merit and shall be discussed in turn below. The gravamen of Michael Paul Slattery's claim regarding James Shepherd is this: Shepherd was obviously lying about how and why he entered the FunAtHome chat room – and about the timing of his initial contact with Slattery. Indeed, James Shepherd was later convicted in state court of molesting his stepdaughter Ashley – the very girl with whom he and Slattery had discussed having sex. Shepherd's conviction on state charges was, however, for sexual contact with his daughter *after* the petitioner's conviction on federal charges. Slattery, however, argues that the government knew, or should have known, that Shepherd was molesting his daughter – and had a duty to turn over that information to the defense. After all, Shepherd was frequenting the FunAtHome internet chat room, in which members discuss having sex with their children and arranging to swap children for sexual gratification. Shepherd's stated reason for being in the FunAtHome chat room was ludicrous. The court never believed Shepherd for an instant, and it defies reason that a seasoned government attorney would, either. However, the incredible story

Shepherd gave at trial about his "accidental" entrance into the chat room and whether he was sexually involved in group sex with persons not online, etc., was fully subjected to cross-examination and no evidence has been presented to show the Government had knowledge of Shepherd's activities at that time that would subject the Government to turn over to the defense any exculpatory evidence in its possession.

## Evidentiary Problems – Documents of Questionable Origin

The government introduced one document into evidence that was questionable at best: a document that Shepherd purportedly gathered using a feature of his instant messaging service that records, or logs, the text in instant message conversations. The expert witness from America Online, however, pointed out that such logs are stored on the user's computer (not an America Online computer) in basic text documents that anyone with a modicum of computer experience can modify at will. The document itself even had several indicators that it had been modified from its original format. First, the screen names of the participants in the instant message conversation were conspicuously absent. Second, the text was indented a bit for most entries, but a few entries were not indented, as if someone had electronically cut and pasted the text without paying attention to the format of the entries. Indeed, Slattery testified that the document in question appeared to contain several previous instant message conversations between Slattery and Shepherd blended into one – but with the speaker changed in several places.[7] Shepherd was the only one who could vouch for the accuracy of the document, as America Online does not

---

[7]Michael Paul Slattery did not, however, testify regarding which entries had been modified, even though he stated that he had read and reread the instant message logs many times.

-12-

keep a record of instant message conversations. This brings the court to the biggest evidentiary problem in the trial of this case – the testimony of James Shepherd.

### James Shepherd's Lack of Credibility as a Witness

The government had a large hurdle to clear in convicting Michael Paul Slattery. Simply put, the government's primary witness, James Shepherd, was not credible. Indeed, his testimony regarding how he came into contact with Michael Paul Slattery was beyond belief. He testified that he accidentally entered the incest chat room FunAtHome, where he contacted Slattery. Shepherd testified that Slattery guided the instant message conversation to sex, then sex with minors, and Shepherd was so disgusted and alarmed that he recorded the instant message log and took it to local authorities. Not only was this testimony incredible on its face, but Shepherd came across throughout the proceedings as seedy and untrustworthy, particularly when the defense showed that he had frequented sex sites on the internet and had arranged sexual liaisons that way both before and after Slattery's arrest. The government's decision to use Shepherd as a witness infused the trial with the uneasy sense that the government would use any measure to secure a conviction against Slattery – even turn a blind eye to testimony from its primary witness that was highly questionable, if not actually sinking to the level of perjury.

Despite the feeling shared by nearly everyone in the courtroom that Shepherd was lying during segments of his testimony, the only verifiable discrepancy uncovered was the date and time of Shepherd's initial electronic conversation with Slattery. First, Shepherd's account of the time of day of the contact changed by several hours from the first trial to the second. Second, America Online records showed that Slattery was not logged on during the time in question – and thus could neither have engaged in chat nor instant message conversations with Shepherd during

that time.  The government argued that these discrepancies arose from poor recollection, not from a decision to mislead the court or the jury.  The defense argued just the opposite.  In the end, it did not matter.  Although some of the documentary evidence was questionable, and James Shepherd's testimony was shaky at best, the jury determined that these problems would not prevent a conviction in this case.

**Materiality of Evidentiary Discrepancies**:
**Sufficiency of Other Evidence**

This entire case boiled down to Michael Paul Slattery's intent as he crossed from Alabama into Mississippi.  The evidentiary discrepancies, from questionable documents to the outrageous testimony of James Shepherd, were simply not material to that issue.  First, the defense subjected James Shepherd to blistering cross-examination.  In one exchange after another, Slattery's attorneys eroded Shepherd's already weak credibility to the vanishing point.  For example, when Shepherd denied having sexually explicit photographs on his home computer, the defense produced such photographs copied from that computer.  In every exchange with Slattery's defense attorneys, Shepherd evaded their questions until finally cornered.  Thus, Shepherd's testimony regarding the timing of his chats and instant message conversations – as well as his reasons for being in the FunAtHome chat room at all – carried little or no weight.

In addition, Shepherd's account of the timing of the conversations and his dubious instant message log were only a small part of the evidence showing Slattery's intent.  The government introduced into evidence numerous e-mails, verified chat logs, and recorded conversations, all of which pointed to Slattery's guilt.  Slattery's crime consisted of three basic elements:

(1) crossing state lines, (2) with intent to have sex, (3) with a minor.  Faced with the evidence

adduced against him, Slattery essentially conceded the first two elements.  FBI agents observed

him cross state lines, and the evidence showed that he did so with the intent to have sex with

Shepherd's daughter.[8]  Slattery's testimony centered around his contention that he did not believe

Shepherd's daughter was a minor – and that had he believed she was a minor, he would not have

engaged in sex with her.  (III, p. 563).

　　　　Unfortunately for Slattery, reliable evidence – particularly his own words and actions –

did far more to convict him than the words and papers of James Shepherd.  In instant messages,

e-mails, and recorded telephone conversations, the jury learned the following facts about Michael

Paul Slattery's beliefs as to "Ashley's" age:

1.　　　　Shepherd repeatedly told Slattery that "Ashley" was a minor;

2.　　　　Shepherd told Slattery that "Ashley" was fifteen, but looked eighteen;

3.　　　　Slattery's own expert testified that underage girls can look of age; that is why the

psychosexual evaluation of Slattery had gaps between the approximate ages of the females in the

photographs used in the test;

4.　　　　In an instant message, Slattery said he did not mind that "Ashley" was a minor; indeed,

that excited him.  He liked the idea of having sex with a minor girl so much that he decided to

---

[8]In its response to the instant petition for a writ of *habeas corpus*, the government states, "[Slattery] claimed at trial that he came to have sex with Shepherd and that the conversations about having sex with daughters were only to fulfill Shepherd's fantasies (III, pp. 563)."  A review of page 563, however, reveals that the government has misinterpreted the transcript.  When asked, "So you traveled with the intent to engage in sex," Slattery responded, "I traveled to check out James Shepard, verify who he was, and see if he was lying."  Thus, Slattery never testified that he was interested in having sex with Shepherd – only that he was trying to determine if Shepherd was lying.  The evidence introduced at trial overwhelmingly showed that Slattery's intent was to engage in sex with Shepherd's daughter.

"coach" and "convince" his "daughter" Coy to participate in the liaison – despite her misgivings about "Ashley's" age;

5.      Slattery himself engaged in chats in the "FunAtHome" incest chat room;

6.      Slattery was trying to arrange a sexual liaison with a Tennessee mother and her young daughter (who was approximately eleven years old); Slattery had been conversing with the mother on the internet to see if he could bring that plan to fruition.

Thus, the jurors had ample evidence with which they could conclude that Slattery believed "Ashley" was a minor – and that her very youth was exciting to him. Jurors thus had sufficient evidence to conclude that Slattery had the intent to have sex with a minor when he crossed the Alabama-Mississippi line.

        Slattery offered only two pieces of evidence to show that he did not have such intent. First, he offered his own testimony regarding his doubts as to the ages James Shepherd gave for himself, his wife, and his daughter. Second, he told his girlfriend Coy that he would "check it out" once he arrived in Southaven. The phrase "check it out" is open to many interpretations, and part of the jury's duty was to interpret that phrase. A jury need not reach into Slattery's mind to determine his intent; instead, it may reasonably infer his intent from his actions. *United States v. Kimmel*, 777 F.2d 290, 292 (5th Cir. 1985). By the same token, the jury did not have to believe Slattery when he testified as to what was in his mind. In this case the jury decided that Slattery's actions spoke louder that his words – that the evidence of Slattery's intent, taken as a whole, was sufficient to sustain his conviction.

### Allegations of Entrapment and
### Outrageous Government Conduct

Slattery argues that he was entitled to raise the defense of entrapment, but the court denied counsel's request for a jury instruction on entrapment. The Fifth Circuit ruled against Slattery on this issue during his direct appeal; he is thus barred from raising the issue in the instant petition for a writ of *habeas corpus* under 28 U.S.C. § 2255. *United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986).

While Slattery may not raise the issue of entrapment at this stage of litigation, he has, using the liberal construction of his *pro se* claims mandated by *Haines v. Kerner*, 404 U.S. 519 (1972), articulated a claim of outrageous government conduct, which is related to – yet distinct from – the defense of entrapment. *United States v. Miller*, 799 F.2d 985, 988 (5th Cir. 1986). To claim entrapment, the "defendant alleges that law enforcement officers have enticed him to commit an unlawful act which he had no predisposition to commit. In such a case, the entrapment defense 'focuses on the intent or predisposition of the defendant to commit the crime . . . rather than upon the conduct of the government's agents.'" *United States v. Graves*, 556 F.2d 1319, 1321 (5th Cir. 1997), *cert. denied* 435 U.S. 923 (1978). A claim of outrageous government conduct, however, focuses upon the *actions of government agents* – and does not present any question of fact for the jury. It is solely a question of law for the court. *Id.* at 1322. Government misconduct does not mandate dismissal of an indictment unless it is so egregious that it violates the principle of fundamental fairness under the due process clause of the Fifth Amendment. Courts will find such a violation "only . . . in the rarest of circumstances." *United States v.*

*Asibor*, 109 F.3d 1023, 1039 (5ᵗʰ Cir. 1997), *cert. denied* 522 U.S. 902 (1997). In order to grant relief for outrageous government conduct, a court must find that the defendant suffered actual prejudice to his ability to receive a fair trial. *United States v. Weeks*, 919 F.2d 248, 254 (5ᵗʰ Cir. 1990), *cert. denied*, 499 U.S. 954 (1991). When the defendant seeks dismissal of the indictment based upon outrageous government conduct, he must normally raise the claim prior to trial, otherwise he would have waived the claim. *United States v. Henderson-Durand*, 985 F.2d 970, 973 (8ᵗʰ Cir. 1993), *cert. denied* 510 U.S. 856 (1993). In this case, however, the defendant has alleged that at least part of the government's outrageous conduct occurred *during* the trial – with the government's use of James Shepherd as its primary witness. As such, it would defy logic to require the defendant to raise a claim of outrageous government conduct prior to its occurrence. The court will thus consider this claim.

The defense of outrageous government conduct is appropriate when "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-432, 93 S.Ct. 1637, 1642-43, 36 L.Ed. 366 (1973). The standard for proving outrageous conduct claim is high, and the cases where defendants have successfully invoked the defense are few. No court has drawn a bright-line test to define outrageous government conduct. The test is whether, under the totality of the circumstances, permitting the government to invoke judicial process to obtain a conviction would violate the due process protection of the Fifth Amendment. *United States v. Tobias*, 662 F.2d 381 (5ᵗʰ Cir. 1980).

Cases where a criminal defendant has successfully raised this defense have a common thread: the government involvement in the crime was extensive – particularly when compared to

the involvement of the defendant. For example, in *State v. Hohensee*, 650 S.W.2d 268 (Mo. App. S.D. 1982), state police officers located two career burglars, put them on salary, and enlisted their aid in "setting up" other burglars in various sting operations. An undercover police officer, the two career burglars, and Hohensee set out to burglarize the Brandhorst building in Springfield, Missouri – without the consent of its owner. Hohensee's involvement was limited to parking a half-block away as lookout. In reversing Hohensee's conviction for the burglary, the Missouri appellate court discussed its view of the state's outrageous conduct:

> If the conduct of [the two career burglars] and [the police officer], each acting as a salaried agent of the police department, is subtracted from the Brandhorst break-in, what remains of that midnight enterprise is a lone figure, sitting in a parking lot ½ block away. It is true that defendant had criminal intent but his conduct, standing alone, represented no more of a threat to society than that of a stargazer, similarly situated, contemplating Polaris. It is difficult to conceive a situation where the government's involvement could be greater or the defendant's could be less, and the conduct of the latter still be a likely subject for prosecution.

> The break-in was accomplished by the government agents, whether or not defendant was in the vicinity. If the government agents had not been there, doing their illegal acts, defendant's conduct would not be illegal. There was no showing that the Brandhorst break-in was part of ongoing criminal activities engaged in by defendant prior to his involvement with Officer Roberts and the two salaried felons.

*Id.* at 274. Thus, the deciding factor for the Missouri court was that the government's involvement was extensive. Indeed, Hohensee's conduct – in the absence of the conduct of the government agents – was not criminal and posed no threat to others.

In the present case, Slattery's acts in the absence of government involvement were substantial. Before the government became involved in the case, Slattery struck up an electronic conversation with Shepherd in which the two discussed an exchange of daughters for sexual gratification. Slattery disputes whether he had the idea first, claiming instead that Shepherd came

-19-

up with the plan.  The evidence showed clearly, however, that the plan was in place *prior to*

Shepherd's conversations with local police.  Thus, the government did not come up with the idea

for the two men to meet and exchange daughters; Slattery and Shepherd decided upon that course

of action on their own.  The government merely provided Slattery with the opportunity to travel

from Alabama to Mississippi

Another factor courts have discussed while examining the defense of outrageous

government conduct is physical brutality by the government agents.  *People v. Isaacson*, 378

N.E.2d 78 (N.Y. 1978).  State police officers in *Isaacson* arrested a man for possession of a

controlled substance.  The police soon discovered, however, that the man was innocent, as the

substance thought to be a controlled substance proved instead to be caffeine.  *Id.*  Instead of

releasing the man, the police physically brutalized him and convinced him he was facing a long

prison sentence unless he became an informant.  The man agreed and called Isaacson, a former

drug supplier in Pennsylvania.  The informant cried and begged Isaacson to help him arrange a

drug sale that would enable him to hire an attorney and make bail.  *Id.*  Isaacson refused initially,

but the informant repeatedly begged for help.  Once the informant lured Isaacson across the New

York state line for a meeting, the police arrested Isaacson.  The Court of Appeals of New York

criticized the 'incredible geographical shell game,' the officers' abuse and deception of the

informant, as well as the government's motives for targeting Isaacson.  Basing its decision on

state constitutional due process grounds, the court held:

> [T]he police have simply gone too far.  This court would be paying mere lip
> service to the principle of due process if it sanctioned the continuance of a
> prosecution in the face of the revelations of this record.

*Id.*

Unlike the state agents in *Hohensee*, the government agents in this case did not themselves commit a crime; they only assisted Shepherd in his communications with Slattery once the plan to arrange a meeting was in place. The government provided Slattery with the opportunity to cross state lines to have sex with Shepherd's "daughter," and that limited degree of involvement does not give rise to a constitutional violation. *United States v. Bradfield*, 113 F.3d 515, 521 (5th Cir. 1997) (merely providing a criminal defendant the opportunity to commit the crime does not rise to the level of entrapment). Further, unlike the police in *Isaacson*, the government in this case brutalized neither Slattery nor Shepherd. The government did not force Slattery to cross state lines for a sexual liaison with Shepherd's minor "daughter;" to the contrary, as shown in numerous e-mails, instant messages, and recorded phone messages, Slattery was quite eager for the encounter even before the government became involved. For all these reasons, Slattery's claim of outrageous government conduct must fail.

### Standard for Ineffective Assistance of Counsel

In Ground One of the instant petition for a writ of *habeas corpus*, Slattery raises seven issues implicating ineffective assistance of counsel. To prove that his counsel was ineffective, a petitioner must show that "(1) his counsel's performance was deficient and (2) the deficient performance prejudiced his defense." *Pitts v. Anderson*, 122 F.3d 275 (1997); *see Strickland v. Washington*, 466 U.S. 668, 687 (1984). The petitioner must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. The court is not to analyze counsel's actions with the crystal clarity of hindsight; instead, the court must judge

counsel's decisions with great deference.  *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994); quoting *Strickland*,  466 U.S. at 689.  If the court finds counsel's performance deficient, "then [the court] must determine whether there exists a reasonable probability that but for the complained-of error the outcome of the trial or appeal would have been different."  172 F.3d at 275 (quoting *Sharp v. Johnson*, 107 F.3d 282, 286 n.9 (5th Cir. 1997)).

## Ground One - Ineffective Assistance of Counsel

Slattery's first ground for relief in his petition for a writ of *habeas corpus* comprises seven sub-grounds.  His first three arguments are that counsel were ineffective for failing to investigate mitigating exculpatory evidence, namely the computer, telephone, printer, employment, and America Online records of James Shepherd, the offense report Shepherd submitted to the police, as well as testimony of Shepherd's common-law wife Kimberly Clark and her daughter Ashley.  Slattery's focus in the first three grounds is that his counsel did not discover that Shepherd was sexually abusing his minor daughter.

First, there is no evidence of record – even now – that Shepherd was sexually abusing his daughter during either of the two trials of this case.  Shepherd was convicted for sexual contact with his daughter *after* Slattery was tried and convicted in this court.  In an effort to show that Shepherd was abusing his daughter Ashley at the time of Slattery's federal trial, Slattery attached a transcript of a police interview with Shepherd as an exhibit to his October 31, 2002, submission to the court.  The evidence is, however, equivocal.

The investigating officer asked, "When the federal case was going on, were you having sex with Ashley?"

Shepherd responded, "Possible, I've never done anything else to anyone like this." Thus, the statement given by Shepherd himself on whether he was having sex with his daughter at the time of Slattery's trials is ambiguous. According to Shepherd, it is only "possible" that he was having sex with his daughter at the time of Slattery's trial. Likewise, in a statement Ashley gave the police, she states that the abuse started when they lived "in the house in Southaven." Again, it is not clear from this statement whether the abuse occurred during either of the federal trials in this matter. Indeed, even if Shepherd had been sexually abusing his daughter at that time, there is no evidence that the government or Slattery's counsel knew about it. The police took Shepherd's statement May 10, 2001; Ashley gave two statements, one on May 10, 2001, and one on May 15, 2001. Thus, neither Slattery's counsel nor the government could have had access to the statements in either of the 1999 trials of this case.

Finally, the information Slattery seeks to bring before the court is not relevant to his illegal act of crossing state lines with the intent to have sex with Shepherd's minor daughter Ashley. The focus of Slattery's *habeas corpus* petition has been to show that James Shepherd is a despicable man, trolling the internet in search of sexual partners for himself, his wife, and his minor daughter. Certainly Shepherd's conduct and testimony were suspect. Through cross-examination, however, Slattery's counsel painted a vivid and accurate picture of James Shepherd – a picture those attending the trial of this case shall not soon forget. Slattery's counsel were well-prepared, well-versed in the law, and familiar with the details of the case. Counsel posed numerous objections, many of which were sustained, and subjected prosecution witnesses to vigorous cross-examination. As a result, Shepherd had essentially no credibility after counsel's cross-examination.

Michael Paul Slattery was convicted mainly on the strength of his own words and actions showing his intent to have sex with the minor girl "Ashley." In light of the evidence from Slattery's own lips, the court cannot perceive how evidence gleaned from additional witness interviews or a review of Shepherd's records would have prevented Slattery's conviction in this case. Slattery's first three allegations of ineffective assistance of counsel shall thus be denied.

In his next two claims of ineffective assistant of counsel, Slattery argues that counsel were ineffective in failing to object to the court's denial of an entrapment instruction and in failing to adduce sufficient evidence to warrant an instruction on entrapment. As discussed above, however, the Fifth Circuit ruled that such an instruction was not proper. As such, this court is precluded from considering the issue again. *United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986). These claims shall thus be dismissed as procedurally barred.

In his fifth claim of ineffective assistance of counsel, Slattery argues that counsel were ineffective for failing to challenge the jury instruction regarding intent, particularly the language "as a general rule." The jury instruction in question, G-4, reads:

> Intent may be proved by circumstantial evidence. Indeed, it can rarely be established by any other means. While witnesses may see and hear and be able to give direct evidence of what a defendant does or fails to do, of course there can be no eye witness account of the state of mind with which the acts were done or omitted. But what a defendant does, or fails to do, may indicate intent, or lack of intent, to commit the offense charges.

> *As a general rule*, it is reasonable to *infer* that a person ordinarily intends the natural and probable consequences of his knowing acts. The jury may draw the inference that the accused intended all of the consequences which one standing in like circumstances and possessing his knowledge should reasonably have expected to result from any intentional act or conscious omission. Any such inference drawn is entitled to be considered by the jury in determining whether or not the government has proved beyond a reasonable doubt that the defendant possessed the required criminal intent.

This instruction is taken from *United States v. Kimmel*, 777 F.2d 290, 292 (5th Cir. 1985); emphasis has been added to highlight the language at issue in this case.

Slattery argues that the phrase "[a]s a general rule," transforms the instruction given into an instruction *requiring* the jury to find the element of intent against Slattery. *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450 (1979). The impermissible language in *Sandstrom* was, "The law *presumes* that a person intends the ordinary consequences of his voluntary acts." *Id.* (emphasis added). Defense counsel objected, arguing that the use of the word "presumes" shifted the burden of proof on the element of intent, thus requiring the defendant to prove his innocence, or at least a facet of it, rather than requiring the prosecution to prove the defendant's guilt. The Supreme Court agreed with the defendant, reversed his conviction and remanded for further proceedings. In its analysis of the offending language, the Supreme Court found that use of the word "infer," rather than "presume," would not offend constitutional principles:

> Sandstrom's jurors were told that "[t]he law *presumes* that a person intends the ordinary consequences of his voluntary acts." They were not told that they had a choice, or that they might *infer* that conclusion; they were told only that the law presumed it. It is clear that a reasonable juror could easily have viewed such an instruction as mandatory.

*Id.* at 515 (emphasis added). Thus, the offending language in *Sandstrom* was "presume," and use of the word "infer," as used in the jury instruction in the instant case, is permissible. In addition, the court finds that the phrase "as a general rule" does not shift the burden of proof to the defense. For this reason, Slattery's claim regarding the constitutionality of jury instruction G-4 shall be denied. This ground for relief is thus without merit and shall be denied.

In his final ground for relief under the theory of ineffective assistance of counsel, Slattery argues that counsel were ineffective because they did not seek to quash the indictment for want

of subject matter jurisdiction.  As a basis for this motion, the plaintiff reasons that the government did not submit proof that Slattery was located on federal property when he crossed from Alabama into Mississippi; nor did the government show that Slattery held the requisite criminal intent while he was in "interstate commerce," *i.e.* crossing state lines.  Thus, he argues, the court lacked subject matter jurisdiction to hear the case.

This ground is without merit, and Slattery's counsel cannot be held to task for failing to raise meritless arguments.  Section 2423(b) provides that "a person who travels in interstate commerce, . . . for the purpose of engaging in any sexual act with a person under 18 years of age *that would be* in violation of Chapter 109A *if the act occurred* in the special maritime and territorial jurisdiction of the United States shall be [guilty of an offense]" (emphasis added).  The jurisdictional element of Section 2423(b) is traveling in interstate commerce.  The government proved that element with testimony from an FBI agent who observed Slattery travel from Alabama to Mississippi on November 12, 1998.  Offenses under Chapter 109A fall under federal jurisdiction because they occur on Federal property; those offenses do not require proof of interstate travel.  Chapter 109A – to which Section 2423(b) refers – defines the conduct giving rise to the offense, not jurisdiction.  The statute does not require the offense to occur on Federal property – only that the intended sexual act be a violation *if* committed on federal property.  Slattery argues that the offense must involve both crossing an interstate line and then occur on Federal property.  This argument is wholly without merit and shall be denied.

### Grounds Two and Three: Challenges to
### the Constitutionality of § 2423b and 2243a

Slattery's next two grounds challenge the constitutionality of 18 U.S.C. § 2423(b) and 2243a for two reasons:  (1) the offense was not committed on federal property, and (2) the statutes were used to convict Slattery for his thoughts in the absence of an overt act.  Neither of these arguments has merit.  The first of these claims was discussed above, is without substantive merit, and shall be denied.  The second claim is equally meritless.  The overt acts required under § 2423(b) are interstate travel – and whatever overt acts the defendant carries out to show his intent to engage in sex with a minor.  As discussed at length above, the jury had more than sufficient evidence of both to support Slattery's conviction.  In addition, no reported case has found the statute at issue – or other criminal sections of Chapter 117 (transportation for illegal sexual activity and related crimes) – to violate the Constitution.  *United States v. Han*, 230 F.3d 560 (2d Cir. 2000)(§ 2423 constitutional); *United States v. Brockdorff*, 992 F.Supp. 22 (D.D.C. 1997)(same); *United States v. Bailey*, 228 F.3d 637 (6th Cir. 2000), *cert. denied*, 532 U.S. 637 2001)(§ 2422 prohibiting enticement of minors across state lines to engage in sexual activities held constitutional); and *United States v. Kufrovich*, 997 F.Supp. 246 (D.Conn. 1997)(same). For these reasons, Slattery's last two grounds for relief are without merit and shall be denied.

In sum, all of the petitioner's grounds for relief are without merit and shall be denied.  A final judgment consistent with this memorandum opinion shall issue today.

**SO ORDERED,** this the 30th  day of September, 2005.

/s/ Neal Biggers

_____
NEAL B. BIGGERS
SENIOR U. S. DISTRICT JUDGE